Armada v New York-Presbyterian Brooklyn Methodist Hosp. (2025 NY Slip Op 51870(U))

[*1]

Armada v New York-Presbyterian Brooklyn Methodist Hosp.

2025 NY Slip Op 51870(U)

Decided on November 25, 2025

Supreme Court, Kings County

Mallafre Melendez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on November 25, 2025
Supreme Court, Kings County

Lucyna Broszkiewicz Armada and PAUL ARMADA, Plaintiffs,

against
New York-Presbyterian Brooklyn Methodist Hospital, JILL-ANN SWENSON, M.D., 
 JAYME UY, M.D., and ERIN CARAHER, M.D., Defendants.

Index No. 506129/2022

Plaintiffs
Emily C. Vaught ([email protected])
Merson Law, PLLC
950 Third Avenue 18th Floor,
New York, NY 10022
212-603-9100
Defendants New York-Presbyterian Brooklyn Methodist Hospital, Jayme Uy, M.D., and Erin Caraher, M.D.
Kristyna Burkova ([email protected])
Wilson Elser Moskowitz Edelman & Dicker LLP
150 E 42nd Street, 
New York, NY 10017
212-915-5262
Defendant Jill-ann Swenson, M.D.
Martin B. Adams ([email protected])
DOPF, P.C.
112 West 34th Street, Suite 1555,
New York, NY 10120
212-244-9090

Consuelo Mallafre Melendez, J.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:
NYSCEF #s: Seq. 3: 60 — 64, 65 — 85, 106 — 110, 111 — 125, 126 — 129, 134
Seq. 4: 86 — 88, 89 — 98, 106 — 110, 111 — 125, 132 — 133
Defendant Jill-Ann Swenson, M.D. ("Dr. Swenson") moves for an Order, pursuant to CPLR 3212, granting summary judgment in her favor, dismissing Plaintiffs' Complaint against her, and removing her from the caption of this action (Seq. No. 3).
Defendants New York-Presbyterian Brooklyn Methodist Hospital ("New York Presbyterian"), Jayme Uy, M.D. ("Dr. Uy"), and Erin Caraher, M.D. ("Dr. Caraher") separately move for an Order, pursuant to CPLR 3212, granting summary judgment in their favor (Seq. No. 4).
Plaintiffs oppose the motions with respect to all Defendants. Plaintiffs do not oppose the part of the motions seeking summary judgment on the lack of informed consent claim. The part of Plaintiffs' opposition requesting sanctions against the movants has been withdrawn by stipulation.
Plaintiffs commenced this action on March 2, 2022, asserting claims of medical malpractice in connection with the treatment of a post-partum hemorrhage and development of Sheehan's Syndrome (also referred to as Sheehan Syndrome), including pituitary gland necrosis, stroke, and neurological damage. The patient's husband also asserts claims for loss of services.
Plaintiff Lucyna Broszkiewicz Armada ("the patient") was admitted to New York Presbyterian on April 9, 2021, by her private ob/gyn Dr. Swenson. Due to the patient's risks for vaginal delivery, including preeclampsia and history of uterine surgery, Dr. Swenson performed a scheduled C-section delivery on April 11, 2021. Dr. Uy was the anesthesiologist for the procedure. The patient experienced a hemorrhage which was controlled intraoperatively, and she was sent to the PACU after the procedure. Her estimated blood loss was approximately 1500 mL, and quantitative blood loss was later recorded as 2700 mL.
On April 12, the patient reported symptoms including dizziness, blurred vision, and headache. First-year resident Dr Caraher documented her symptoms and placed an order for one unit of packed red blood cells, which were transfused at approximately 9:30 p.m. that evening. There is no indication that Dr. Swenson saw the patient on April 12, 2021, or that she was notified about the patient's status on that date. On April 13, 2021, Dr. Swenson saw the patient again. The patient was discharged with her infant on April 14, 2021.
On April 17, the patient returned to the New York Presbyterian emergency department with altered mental status worsening over two days. An MRI revealed a pituitary infarct consistent with Sheehan's Syndrome, a pituitary gland condition associated with blood loss during childbirth. She had also suffered a right posterior ischemic stroke.
Plaintiffs allege that Dr. Swenson departed from the standard of care in her performance of the C-section and failure to order a blood transfusion intraoperatively and in the post operative period during which she was involved. Plaintiffs further allege that anesthesiologist Dr. Uy departed from the standard of care by not ordering a blood transfusion, and resident Dr. Caraher and New York Presbyterian staff departed from the standard of care in her post-operative monitoring and treatment. Plaintiffs allege these departures caused or contributed to the patient's injuries, including development of Sheehan's Syndrome.
In evaluating a summary judgment motion in a medical malpractice action, the Court applies the burden shifting process summarized by the Second Department: "[A] defendant must make a prima facie showing either that there was no departure from good and accepted medical practice, or that the plaintiff [*2]was not injured by any such departure" (Rosenzweig v Hadpawat, 229 AD3d 650, 652 [2d Dept 2024]). "In order to sustain this prima facie burden, the defendant must address and rebut any specific allegations of malpractice set forth in the plaintiff's complaint and bill of particulars" (Martinez v Orange Regional Med. Ctr., 203 AD3d 910, 912 [2d Dept 2022]). "Once a defendant physician has made such a showing, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact, but only as to the elements on which the defendant met the prima facie burden. Summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions." (Rosenzweig at 652 [2d Dept 2024] [internal quotation marks and citations omitted].) However, "expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (Barnaman v Bishop Hucles Episcopal Nursing Home, 213 AD3d 896, 898-899 [2d Dept 2023]).
In support of Dr. Swenson's motion (Seq. No. 3), the movant submits an expert affirmation from Victor Grazi, M.D. ("Dr. Grazi"), a licensed physician. Dr. Grazi affirms he is a diplomate of the American Board of Obstetrics and Gynecology, and that he has extensive experience performing C-section deliveries and treating intraoperative and post-partum hemorrhage.
Dr. Grazi opines that Dr. Swenson's treatment of the patient complied with the standard of care, and the C-section delivery on April 11 was indicated and timely. The expert opines that hemorrhage is a known risk of C-section, even if properly performed. He opines that Dr. Swenson "promptly recognized bleeding in the posterior portion of the uterine wall," and she stopped the bleeding by removing the placenta and oversewing the area.
The expert states that because the patient lost a greater than average amount of blood (over 1000 cc), Dr. Swenson appropriately called for blood products as a precaution and ordered a "stat intraoperative hemoglobin check." The result of the hemoglobin test was normal (11), and therefore the expert opines that no blood transfusion was required.
The expert further opines that the patient experienced a "brief interlude of intraoperative maternal hypotension" from 12:40 p.m. to 1:00 p.m., but her blood pressure returned to normal after one dose of Ephedrine and vasopressors. The expert opines this was not an indication the patient needed a blood transfusion, because a temporary drop in blood pressure is common during a C-section with anesthesia. The expert similarly opines that tachycardia and decreased urine output are common side effects during and immediately after a C-section, and these symptoms resolved after she was transferred to the PACU. Thus, the expert opines that these findings were not related to blood loss and did not indicate the need for a blood transfusion.
The expert also opines that the patient's history of preeclampsia increased her risk of complications from a blood transfusion. Such complications include respiratory distress, infection, fever, fever, hemolysis, and transfusion-related circulatory overload or lung injury. The expert opines that it was appropriate to take a conservative approach to blood transfusion, and if the patient's hemoglobin was above 7, it should only be performed if "justified." The expert opines it was not justified in the patient's case because the bleeding was stopped intraoperatively and her blood pressure returned to normal.
The expert notes that Dr. Swenson was not involved in the patient's care on April 12, when she received a blood transfusion in response to syncopal episodes and headache. When Dr. Swenson saw the patient the following day on April 13, the expert opines that the patient did not require any further blood transfusion, because her hemoglobin remained above 7, her vital signs were stable, and her symptoms had improved.
Additionally, the expert opines that the recorded quantitative blood loss (2700 mL) was higher than the initial estimated blood loss because "in many cases amniotic fluid and irrigation fluid are included" when measuring blood-soaked items. The expert opines that as the patient was "clinically and hemodynamically stable with normal hemoglobin and normal blood pressure," the 2700 mL number likely exceeded the volume of her actual blood loss.
On the issue of proximate causation, the expert opines that the patient suffered an acute ischemic stroke after her April 14 discharge, which was "unrelated" to her intraoperative blood loss and likely [*3]caused by preeclampsia and thrombophilia. The expert states that the patient was able to breast feed following delivery on April 13 and April 14, which would not be possible if she had Sheehan's Syndrome. Therefore, he opines that "it is conceivable her pituitary infarct is related to the ischemic stroke she experienced after her discharge" rather than being caused by blood loss during the C-section.
Based on evaluation of the submissions, the movant has established prima facie that Dr. Swenson did not depart from the standard of care in her performance of the C-section and treatment of the patient's intraoperative hemorrhage. The movant offered an expert opinion that Dr. Swenson properly repaired the source of the hemorrhage, and a blood transfusion was not required by the standard of care based on the patient's clinical presentation and hemoglobin levels. However, movant's expert's opinion is conclusory as to Dr. Swenson's evaluation and treatment of the patient on April 13th; thus entitlement to summary judgment is not established on any evaluation and/or treatment by Dr. Swenson on this date.
The burden therefore shifts to Plaintiffs to raise an issue of fact on the standard of care with regards to the intraoperative period and evaluation and treatment rendered on April 11.
However, on the issue of whether the patient's pituitary gland damage and stroke were proximately caused by the departures claimed, the movant's expert is conclusory, speculative, and controverted by the record. The movant's argument that the patient's blood loss did not cause or contribute to her pituitary gland infarct is supported only by the expert's interpretation of the medical chart that she was able to breastfeed following delivery. As Plaintiffs argue in their opposition, the patient testified that she was never able to breastfeed, and the chart entries quoted by the expert ("mother is pumping consistently and comfortably") are under the heading "Goal" and "Goal met? No." Further, the expert does not address or comment on the multiple references in the medical record to the patient's eventual diagnosis of "Sheehan's Syndrome as a result of your post-partum bleeding." The opinions of the expert that her claimed injuries were entirely caused by an unrelated ischemic event are therefore speculative, unsupported by the record, and do not establish entitlement to summary judgment on the issue of proximate causation.
In opposition, Plaintiffs submit an expert affirmation from a licensed physician [name of expert redacted], board certified in obstetrics and gynecology, who affirms they have "multiple decades of experience" and background in the issues relevant to this case, including managing C-section deliveries and post-partum hemorrhage as an attending obstetrician in a hospital setting. The Court was presented with an unredacted, signed copy of the affirmation for in camera inspection.
Plaintiffs' ob/gyn expert opines that Dr. Swenson departed from the standard of care in failing to identify and control the patient's intraoperative hemorrhage, failing to give a blood transfusion, and failing to follow up with the patient post-operatively with regards to her blood loss. The expert opines that Dr. Swenson deviated from good and accepted medical standards by failing to administer any blood transfusion intraoperatively in light of her shock index and the amount of blood loss. It is Plaintiffs' expert's opinion that Dr. Swenson's misappraisal of the amount of blood loss and other indicators was a departure from the standard of care and was a cause of her injuries. The expert also opines that Dr. Swenson did not properly evaluate the patient post-partum on April 13, 2021
Plaintiffs' expert notes that a post-partum hemorrhage is defined by cumulative blood loss of 1000 mL or greater, or blood loss combined with signs of hypovolemia ("increased thirst, dizziness, weakness, headache, fatigue") within 24 hours of delivery. The expert counters Dr. Grazi's opinion that the patient's hemoglobin levels were stable intraoperatively, opining that the sheer amount of recorded blood loss (over 1000 ccs) was "clearly abnormal," and her full clinical picture including urine output and shock index warranted a blood transfusion. The expert adds that the quantitative blood loss was measured at 2700 ccs, fifty percent of her total blood volume, which far exceeded the "estimated blood loss" in the record of 1500 ccs.
The expert notes there is almost always some discrepancy between the estimated blood loss (EBL) and quantitative blood loss (QBL), however opines that Dr. Swenson misappraised the amount of blood loss by well over 1,000ccs (1500cc-2700cc). The expert critiques "Dr. Swenson's inability to [*4]visually recognize a blood loss exceeding fifty percent of Ms. Armada's total blood volume" and opines that she did not properly appreciate the blood loss and transfuse as the standard of care required of her. The expert adds that the patient suffered brain damage due to lack of oxygenated blood as a result.
The expert also opines the standard of care required monitoring a patient's pulse, blood pressure, urine output, and shock index (heart rate over systolic blood pressure). In addition to the known intraoperative blood loss, the patient suffered hypotension and tachycardia intraoperatively, with her blood pressure falling to as low as 90/50 and her heart rate as high as 120. The expert opines that this combination of hypotension and tachycardia is a sign of significant blood loss and indicates that the patient's body was trying to compensate for the drop in blood volume/pressure by increasing the heart rate, i.e. hypovolemia. The records indicate that the patient's shock index intraoperatively was 1.33. The expert opines that the patient's intraoperative shock rate alone, but also in conjunction with the believed blood loss at that time of 1000cc's, should have triggered a massive transfusion protocol.
The expert disagrees with Dr. Grazi that the patient's hypotension was brief and not significant. Plaintiffs' expert states that "in the context of ongoing hemorrhage and an elevated shock index, even a 20-minute period of maternal hypotension is not benign" and indicated a need for transfusion "to restore circulating volume and prevent end-organ damage."
The expert further opines that the anesthesiologist's administration of 3000 ccs of Lactated Ringer's ("a sterile solution used to replenish fluids and electrolytes in the body") was not sufficient to treat her blood loss, and packed red blood cells containing hemoglobin were required. The expert opines that the patient's urine output was still low and a "strong indicator of hypovolemia/hypovolemic shock" which was not properly treated. The expert states that hypovolemic shock is a life-threatening condition caused by severe loss of blood, leading to inadequate blood flow and oxygen delivery to the body's organs, including the brain.
The expert opines that the standard of care requires an obstetrician to anticipate hemorrhage and be prepared to respond rapidly where, as in this case, the patient has risk factors including advanced maternal age, prior uterine surgery, and blood clotting disorders.
Additionally, Plaintiffs' expert opines that Dr. Swenson failed to properly remove the patient's placenta in the face of placenta accreta. The expert bases this opinion on the references to placenta accreta in the record, which the expert states is "a serious pregnancy condition wherein the placenta grows into the uterine wall such that it does not properly detach after childbirth." The expert further opines that Dr. Swenson's intraoperative findings and the fact she performed a "piecemeal" removal of the placenta were consistent with placenta accreta.
In the expert's opinion, the standard of care in the face of placenta accreta is a C-section delivery followed by a hysterectomy. The expert opines it was a departure from the standard of care for Dr. Swenson to "cleave the placenta from the uterus in a piecemeal fashion," which can result in hemorrhage.
Plaintiffs' expert opines that the "technically feasible" alternative to a hysterectomy in the face of placenta accreta was conservative management, allowing the body to reabsorb the remaining placenta. However, the expert opines that "this approach requires close observation and ongoing monitoring of the patient to assess for complications such as infection and to ensure that the placenta resolves," which did not happen in this case.
With respect to the claim that Dr. Swenson improperly removed the placenta in a "piecemeal" fashion despite placenta accreta, the movant argues this issue was improperly raised by Plaintiffs for the first time in opposition and was not claimed in the bill of particulars. It is noted however that in Dr. Grazi' initial affirmation he opined that Dr. Swenson properly repaired the source of the hemorrhage. Nonetheless, Dr. Swenson's expert submitted a supplemental affirmation in reply addressing placenta accreta. The Court accepted the expert's supplemental affirmation on this issue and permitted Plaintiffs to submit a sur-reply.
In defendant's supplemental affirmation, Dr. Grazi opines that based on the medical record, the patient did not have a full placenta accreta warranting a hysterectomy, as the only references to "placenta [*5]accreta" are within the billing summary rather than the operative report. Even if there was placenta accreta, the defendant's expert opines that it was within the standard of care to remove the placenta in a piecemeal fashion and then oversew the area of defect, as Dr. Swenson did.
Lastly, addressing plaintiffs' claims against Dr. Swenson during the post-operative period, their expert notes that on April 13, 2021, a subsequent blood panel was again significant for low RBC count (3.15), low hemoglobin (9.6), low hematocrit (28.3), and low platelets (97). Plaintiffs' expert opines that there is no indication in the chart that the patient's sodium levels were checked on April 13 and no indication of any electrolyte panels nor if electrolytes were drawn or given. In the expert's opinion, no chemistry labs were taken after the patient's syncopal episodes and the blood transfusion prior to her discharge.
On the issue of proximate causation, Plaintiffs' expert opines that the patient's severe blood loss and hypovolemic shock during the C-section directly led to "inadequate blood flow and oxygen delivery to the body's organs, including the brain," which proximately caused her neurological injury and Sheehan's Syndrome. The expert explains that Sheehan's Syndrome "occurs when there is an obstetric hemorrhage during or after childbirth that leads to ischemic necrosis [tissue death] in the pituitary gland." The expert further opines that her post-partum hemorrhage caused or contributed to her additional ischemic stroke in the right posterior cerebral artery, due to reduced blood flow.
Based on the submissions, Plaintiffs' expert has raised clear issues of fact with respect to Dr. Swenson's intraoperative treatment of the hemorrhage and whether a blood transfusion should have been performed in light of her volume of blood loss and symptoms of hypovolemic shock. While Dr. Grazi's opinions are conclusory as to the post operative period during which the record indicates that Dr. Swenson evaluated and treated the patient, as aforementioned, the Plaintiffs' expert also raises issues of fact as to Dr. Swenson's role in her post-operative treatment and evaluation, and as to claims that she failed to order further tests and blood transfusion when she examined the patient on April 13.
Notwithstanding the Court's finding that Dr. Swenson's expert did not meet their prima facie burden as to proximate causation, Plaintiffs' expert addressed the issue of proximate cause with respect to the patient's development of Sheehan's Syndrome and her cerebellar stroke and raises an issue of fact.
Additionally, upon consideration of all the submissions and sur-reply, there also remain issues of fact as to whether the patient exhibited placenta accreta and whether Dr. Swenson departed from the standard of care by performing a piecemeal removal of the placenta. Plaintiffs' expert opines that attempting to "forcibly remove the placenta" in these circumstances creates a risk of severe hemorrhage from tearing blood vessels. Thus, the expert opines Dr. Swenson's "piecemeal" removal of the placenta in the face of placenta accreta was the direct cause of her intraoperative hemorrhage and resulting injuries.
Notwithstanding, the Court does not make a ruling herein as to whether a motion to amend the pleadings should be made by Plaintiffs or if same should be granted No such application is before the Court.
As issues of fact are raised as to both liability and causation as to the claims against Dr. Swenson, summary judgment is not warranted. For the reasons above, Dr. Swenson's motion for summary judgment is granted to the extent of dismissing the lack of informed consent claim without opposition, and the motion is otherwise denied.
Turning to the part of the motion seeking summary judgment for Dr. Caraher and New York Presbyterian, the movant submits an expert affirmation from Wendy Fried, M.D. ("Dr. Fried"), a licensed physician board certified in obstetrics and gynecology.
Dr. Fried addresses the post-operative care for the patient by resident Dr. Caraher and other New York Presbyterian staff. Firstly, the expert notes that Dr. Caraher was a hospital intern/first-year resident, and she was acting under the direction and supervision of nonparty Heather Jones. M.D. ("Dr. Jones") at all times. It is not disputed that Dr. Jones was the patient's attending ob/gyn from Guirguis Obstetrics and Gynecology, the private practice of Dr. Swenson which had treated her throughout her pregnancy. Dr. Fried states that Dr. Caraher "did not make any independent decisions, and all of her observations and [*6]examination findings were discussed" with Dr. Jones.
Dr. Fried agrees with the opinions of the other defendants' experts that a blood transfusion was not indicated for the patient due to its risks and a combination of factors, including the patient's relatively stable vital signs and initial hemoglobin of 11. Although the patient's hemoglobin later dropped to 8.8 following the C-section, the expert opines this was not uncommon, the patient was not symptomatic, and her vital signs remained stable.
On the following day, April 12, Dr. Fried notes that the patient had two syncopal/fainting episodes, headaches, and blurry vision. These symptoms were recorded by Dr. Caraher and reported and discussed with the patient's private attending physician, Dr. Jones, who made the decision to transfuse the patient when her hemoglobin dropped to 8.2. The expert notes that the patient's "condition improved" after the transfusion of one unit of packed red blood cells that evening, and her hemoglobin increased to 10.4.
The expert opines that at all relevant times, Dr. Caraher appropriately monitored the patient's vital signs and symptoms and took direction from the private attending physician, Dr. Jones. The expert further opines that Dr. Jones' decision to transfuse the patient with one unit of packed red blood cells on April 12 was "timely and appropriate" given her worsening symptoms and hemoglobin levels. The patient was ultimately discharged on April 14 by her private physician, Dr. Guirgus.
Based on the submissions, the movants have established prima facie entitlement to summary judgment on behalf of Dr. Caraher. Further, "(w)hen supervised medical personnel are not exercising their independent medical judgment, they cannot be held liable for medical malpractice unless the directions from the supervising superior or doctor so greatly deviates from normal medical practice that they should be held liable for failing to intervene" (Bellafiore v Ricotta, 83 AD3d 632, 633 [2d Dept 2011]; Soto v Andaz, 8 AD3d 470, 471 [2d Dept 2004]. Thus, a defendant may demonstrate entitlement to summary judgment by demonstrating that the nurse and hospital staff did not exercise independent medical judgment and that the acts of the supervising physician did not so greatly deviate from normal practice that they should have intervened.
Here, the medical record, testimony, and expert submissions demonstrate that defendant Dr. Caraher was a hospital resident who did not exercise independent medical judgment, and there is no allegation she failed to properly document or report the patient's symptoms to the supervising physician. That private attending physician, Dr. Jones, was consulted about her symptoms and directed Dr. Caraher to order the blood transfusion on April 12. A private physician was also responsible for the patient's discharge on April 14.
Furthermore, Dr. Fried opines in her expert affirmation that failing to provide an earlier or greater blood transfusion during the post-operative period was not a departure from the standard of care, and it was not an act or omission that "so greatly deviated from normal practice" that Dr. Caraher was liable for failing to intervene.
Plaintiffs' obstetrics and gynecology expert opines that the blood transfusion performed on April 12, over 30 hours after the C-section, was not timely or adequate to address her blood loss. Additionally, the expert opines that Dr. Caraher "facilitated a transfusion of only one unit" of packed red blood cells, whereas the standard of care for severe hemorrhages requires a "massive transfusion protocol" of 10 units over the course of 24 hours.
However, Plaintiffs' expert does not opine as to whether Dr. Caraher exercised independent medical judgment. Additionally, they do not counter that all symptoms of blood loss were known and provided to the patient's private attending physicians, and that the blood transfusion was merely "facilitated" by Dr. Caraher under the direction of the private ob/gyn Dr. Jones. Although the expert opines that providing only one unit of red blood cells was a departure from the standard of care, they have not demonstrated that this act or omission so greatly deviated from normal practice that Dr. Caraher or other New York Presbyterian medical staff in residence should have intervened or overrode the attending physician's judgment.
Accordingly, the part of the motion seeking summary judgment on behalf of Dr. Caraher is granted.
Finally, in support of the motion for summary judgment on behalf of Dr. Uy (Seq. No. 4), the movant submits an expert affirmation from Yaakov Beilin, M.D. ("Dr. Beilin"), a licensed physician board certified in anesthesiology.
Dr. Beilin opines that all treatment rendered to the patient by Dr. Uy as an anesthesiologist was within the standard of care. The expert does not dispute that Dr. Uy could have recommended or administered a blood transfusion during the procedure if it was indicated. He states that "the medical judgment to provide blood for transfusion during a delivery is based on a collaboration between the surgeon and the anesthesiologist," and Dr. Uy had an independent role of monitoring the patient's vital signs while Dr. Swenson monitored the operating field. Based on the findings of Dr. Uy and Dr. Swenson in the operative report, the expert opines that a blood transfusion in the operating room was not necessary.
The expert opines that due to the risks of a blood transfusion, it "should not be provided lightly" and the treating physician and anesthesiologist must evaluate the patient's overall clinical picture. The expert opines that the volume of blood loss is not the only factor to consider, but also "whether the patient would respond to medications in order to maintain her blood pressure and heart rate" after the source of bleeding was repaired. He opines that Dr. Uy appropriately monitored the patient's blood pressure, heart rate, and other vital signs, and he properly administered medications to stabilize the patient's hypotension. The expert also notes that the patient's intraoperative hemoglobin level was 11. Dr. Beilin opines that a hemoglobin of 11 is "generally considered within a healthy range post-partum," and in combination with the patient's stable vital signs and the fact the source of bleeding had been identified and repaired, a transfusion was not required by the standard of care.
The expert further opines that "at the time they were discussing blood transfusion," the patient's estimated blood loss was only 1200 mL, which is considered a hemorrhage but does not warrant a transfusion. The expert opines that even her quantitative blood loss of 2700 mL "would not mandate a blood transfusion" unless she became symptomatic and her hemoglobin dropped, which occurred post-operatively. The expert opines she was properly transfused on the evening of April 12, though Dr. Uy was no longer involved in her care at that time.
On the issue of proximate causation, the expert notes that Sheehan's Syndrome is a "very rare condition" where significant blood loss during or after childbirth triggers an infarct of the enlarged pituitary gland, resulting in long-term hormonal effects. The expert opines that there is no "hard and fast" amount of blood loss that causes this syndrome, and there is little scientific data on whether a blood transfusion during delivery can mitigate or prevent the infarction. Therefore, the expert opines that there is no way to determine whether Dr. Uy's alleged failure to provide a blood transfusion during the C-section proximately caused her development of Sheehan's Syndrome, or whether it was an inevitable result of her hemorrhage.
The movants also submit an expert affirmation from Mark Ellis Molitch, M.D. ("Dr. Molitch"), a licensed physician board certified in internal medicine and endocrinology and metabolism.
Dr. Molitch opines specifically on the issue of proximate causation. The expert opines that the patient did develop Sheehan's Syndrome as a result of her C-section hemorrhage, but that this outcome could not be prevented by Dr. Uy. Dr. Molitch emphasizes that Sheehan's Syndrome is a condition which occurs in the setting of post-partum blood loss over 1000 ccs and hypotension, but it is rare and affects a small but wide-ranging number of patients. The expert notes that Sheehan's Syndrome has been seen in patients with blood loss ranging from "as low as 500 cc to as much as 5000 cc." The expert states that although "one would think that a blood transfusion given at the time of the hemorrhage would prevent or alleviate the infarction," there is not enough scientific data to support this position. The expert opines that there is "no way to tell exactly when the pituitary infarction occurred, and if providing a blood transfusion in the operating room could have stopped an ongoing infarction or stopped an infarction from occurring at all."
In opposition, Plaintiffs submit an expert affirmation from a licensed physician, [name of expert redacted] board certified in anesthesiology. The Court was presented with an unredacted, signed copy of the affirmation for in camera inspection.
Plaintiffs' anesthesiology expert opines that Dr. Uy departed from the standard of care in monitoring and treating the patient's blood loss intraoperatively, including by failing to perform a blood transfusion.
The expert opines that Dr. Uy, as the anesthesiologist, had a duty "jointly" with the obstetrician to determine whether to administer a blood transfusion, as an anesthesiologist's role is to monitor the patient's vital signs while the ob/gyn monitors the operating field. Based on her vital signs during the procedure, the expert states that she had "transient periods of hypotension" throughout the C-section and a "prolonged period of hypotension" for 20 minutes from 12:40 p.m. to 1:00 p.m., during which her blood pressure was 90/50. The expert opines this hypotension combined with her heart rate and low urine output indicates that she was in hypovolemic shock.
Further, the estimated blood loss during the procedure was 1500 ccs, but it was later determined to be 2700 ccs, which the expert opines was an "extraordinary," class IV hemorrhage of over half of the patient's total blood volume. The expert opines that the standard of care requires an anesthesiologist to monitor the suction canister and towels independently from the obstetrician, and Dr. Uy's failure to recognize the severity of the patient's blood loss was a deviation from the standard of care.
The expert opines that the standard of care required a massive blood transfusion of 10 units or more of whole blood or packed red blood cells in light of the patient's condition. The expert counters the movant's argument that her hemoglobin level was stable, opining that it was a departure from the standard of care for Dr. Uy to rely only her hemoglobin level and not her overall clinical signs of hypotension, tachycardia, low urine output, and high volume of actual blood loss. The expert opines that in an acute, rapid hemorrhage, hemoglobin levels "lag behind blood loss" and it may take hours before the drop in hemoglobin is apparent, which is what occurred in this case when the patient's hemoglobin later dropped to 8.8 and 8.2.
The expert notes that Dr. Uy administered medications for blood loss and hypotension throughout the procedure, including Oxytocin, Carboprost, Penylephrine, Ephedrine, and Lactated Ringer's solution. The expert opines that Lactated Ringer's is used for "volume resuscitation in cases of blood loss," but does not address the "underlying issue of oxygen delivery and coagulopathy." Therefore, the expert opines that while Lactated Ringer's is "usually sufficient to treat a class II hemorrhage" of 15-30% blood volume loss, it did not provide adequate treatment for this patient's class IV hemorrhage.
On proximate causation, Plaintiffs' anesthesiology expert disagrees with the movant that there is no way to determine whether a blood transfusion would have mitigated or prevented the pituitary gland damage. The expert counters the movant's statements that there is little research into whether blood transfusion can prevent Sheehan's Syndrome, because it is "exceedingly rare" in the United States and more visible in underdeveloped countries, due to the higher occurrence of "untreated" hemorrhage during birth. In the opinion of Plaintiffs' experts, the infarct of the pituitary gland could have been avoided if oxygen had been timely restored to the brain with intraoperative blood transfusion. The expert opines that the fact "timely performance of a blood transfusion at the time of the hemorrhage prevents and/or alleviates infarction" is clearly supported by the rarity of the condition in countries where significant blood loss is recognized and treated.
In reply, the movants assert that their endocrinology expert has shown "a modicum more credibility" in discussing "the rarity and unpredictability of developing Sheehan's Syndrome and the lack of any known preventative factor," due to that expert's specialization in pituitary disorders. Defendants' counsel also misstates the burden on the plaintiff in a medical malpractice case, stating that "the Plaintiff is unable to show with clear and convincing evidence that the failure to provide a blood transfusion during delivery caused Ms. Broszkiewicz to sustain Sheehan's syndrome, and had she received a blood transfusion during the delivery, she would not have developed Sheehan's syndrome."
At trial, a Plaintiff's burden on the issue of proximate causation is the preponderance or "greater part of the evidence" standard (see NY Pattern Jury Instr., Civil 1:23). The burden on the party establishing their case is "that the evidence supporting [their] case more nearly represents what actually happened than the evidence that is opposed to it" (see Kurz v. Doerr, 180 NY 88, 90 [1904]; Ausch v St. Paul Fire & Mar. Ins. Co., 125 AD2d 43 [2d Dept 1987]). An expert physician need not be a specialist but need only demonstrate to the court that they are "possessed of the requisite skill, training, education, knowledge or experience from which it can be assumed that the opinion rendered is reliable" (DiLorenzo v Zaso, 148 AD3d 1111, 1112-1113 [2d Dept 2017]). Where this threshold of reliability is met, it is not the court's role to determine as a matter of law which expert is more credible.
Based on these submissions, there are issues of fact as to Dr. Uy's alleged departures from the standard of care. Dr. Uy does not dispute that he had an independent duty of care, as the physician administering anesthesia for the procedure, to monitor the patient's vitals and respond to signs of hemorrhage, including by providing a blood transfusion if needed. The parties' experts have provided conflicting opinions as to the standard of care for providing an intraoperative blood transfusion, and whether it was indicated for the patient in light of her hemoglobin levels, hypotension, and other factors. Further Plaintiffs' expert sets forth detailed opinions on the effects of obstetrical hemorrhage on blood flow and brain oxygenation, and despite the rarity of the disorder, the opinions have raised at least a triable issue of fact that the volume of blood loss and hypotension without transfusion proximately caused or worsened her condition.
For these reasons, the Court finds that Plaintiffs have raised clear issues of fact as to proximate causation, as well as issues of fact regarding Dr. Uy's compliance with the standard of care. Ultimately, it is a question of fact for the jury to determine the credibility of expert witnesses and the greater weight of the evidence presented. The part of the motion for summary judgment seeking summary judgment for Dr. Uy is therefore granted to the extent of dismissing claims for lack of informed consent without opposition, and the motion is otherwise denied.
Accordingly, it is hereby:
ORDERED that Dr. Swenson's motion (Seq. No. 3) for summary judgment is granted to the extent of dismissing Plaintiffs' claims for lack of informed consent, and the motion is otherwise denied; and it is further
ORDERED that the part of New York Presbyterian, Dr. Uy, and Dr. Caraher's motion (Seq. No. 4) seeking summary judgment on behalf of Dr. Uy is granted to the extent of dismissing Plaintiffs' claims for lack of informed consent, and the motion is otherwise denied; and it is further
ORDERED that the part of New York Presbyterian, Dr. Uy, and Dr. Caraher's motion (Seq. No. 4) seeking summary judgment on behalf of Dr. Caraher is granted, and Plaintiffs' claims against Dr. Caraher are dismissed; and it is further
ORDERED that any direct claims and vicarious liability claims against New York Presbyterian on behalf of Dr. Caraher are dismissed.
The Clerk shall enter judgment in favor of ERIN CARAHER, M.D.
This constitutes the decision and order of this Court.
ENTER.
Hon. Consuelo Mallafre Melendez
J.S.C.